Space Numbers 121-6265, et al. West Flagler Associates, Ltd. of Florida, Ltd. Partnership doing business as Magic City Casino and Belize Fort Myers Corporation of Florida Corporation doing business as Belize Springs Folger Rooms v. Debra A. Haaland in her official capacity as Secretary of the United States Department of the Interior  Miss Hearing for Debra A. Haaland, et al. Mr. Richard, for the seemingly Crown of Florida Mr. Whitaker, Amici Curiae State of Florida Mr. Hume, for West Flagler Associates, Ltd. et al. Ms. Reed, Amici Curiae, Montserrat, MN, LLC, et al. Good morning, Miss Hearing. We'll hear from you. May it please the Court. My name is Rachel Herons, on behalf of the Federal Government. As your Honors are aware, the Court has allocated 20 minutes of the argument time today to the Federal Government and as possible, I'll try to reserve about three minutes of that time for rebuttal. The question to this Court is whether the Secretary of the Interior acted within her authority under the Indian Gaming Regulatory Act, or IGRA when she took no action on, and thus by operation of statute, allowed to go into effect a gaming contract submitted for her approval by the State of Florida and the Seminole Tribe of Florida. The Secretary did act lawfully. The District Court's concrete conclusion was based on an error of law although admittedly a relatively narrow one that was specific to the fact that this case had the language of the compact that the Secretary was reviewing. What's Flagler in this appeal offers a much broader categorical reading of IGRA that would defend the result below. However, that reading is inconsistent with IGRA's text, in tension with Supreme Court precedent, as well as the stated purposes of the statute and past practice. With the Court's permission, I would start by explaining the District Court's error before moving on to what Flagler's alternate arguments, and then addressing why this Court should decide the issue and specifically reverse the decision below based on the arguments presented by the Federal Government and not those presented by the Tribe in its consolidated appeal, which arguments are inconsistent with this Court's precedent and would radically shrink the APA cause of action. But before getting into those points, I would just want to make one thing clear. There has been a lot of discussion in the briefs in this case about whether the Florida State statute that authorizes the off-Indian lands gaming anticipated by the complex would survive in a judicial challenge brought in Florida's courts. There's also been a lot of speculation on whether the Tribe and the State intended to draft their compact in a way that would provide a workaround in the event that statute fell. Now, the State and Tribe have disclaimed that that was their intent. They have said so to this Court. And they are here today, so to the extent this Court has any questions about that, they may ask them. However, what the Federal Government can say is that the compact they actually crafted, whatever the party's intent may have been, is properly read to be consistent with IGRA. It is properly read not to circumvent State law or to attempt to use IGRA as a ground for independently authorizing off-Indian land gaming. And if the State statute that is related to this action were to be challenged in Florida's State courts and were to fall, the compact that they crafted would give no independent authority for the Tribe to continue to receive bets from outside Indian lands. Under those circumstances, the Secretary was under no obligation to disapprove the compact that was presented to her. So you categorically reject the contention of Wes Flagler that the Secretary has to make a determination that the compact complies with Florida's State law. That's correct, Your Honor. Under this Court's precedent and under the best reading of the statute, the Secretary does have a duty, again under this Court's precedent, to ensure that a compact presented to her does not violate IGRA and has a duty to affirmatively disapprove if it violates IGRA itself. But the statute does not even list noncompliance with State law as the ground on which the Secretary has authority to disapprove a compact. What about the Wire Act or the Internet Gaming Act? Due process, legal protection, or any other aspects of federal or constitutional law? Yes. So, Your Honor, IGRA, specifically Section D8B of Section 2710, does give the Secretary authority to disapprove a compact that violates federal law, including provisions of the federal constitution. But Section D8C of the compact, which deals with the Secretary's authority to take no action, provides only one caveat on that authority to take no action, and that is when the compact contradicts IGRA itself. So for that reason, we read the statute to mean that the Secretary does not have an affirmative duty to disapprove when a compact violates some non-IGRA federal law. In that regard, District Court didn't go into whether there was an actual violation of those federal laws, so is that something that we should take up here? Do we need to do that in making the decision here? Your Honor, I don't think that you need to address that issue. I think you can simply reverse the District Court's decision because the District Court, as we said, erred as a matter of law when it interpreted the compact to violate IGRA itself. Now, obviously, West Ligler has reused those other legal issues as alternate arguments, and they are pure issues of law, so I don't think there's anything stopping the Court from reaching them, but it needs in order to reverse the decision below. What, if any, weight or impact is the Secretary's letter or commentary that came after the 45 days? So, Your Honor, that's a post-decisional letter. We have not requested any deference to the views expressed in that letter that was authored by the Assistant Secretary because it's not a formal decision document by the agency. That being said, I do think that the letter is illuminating in that it shows that, consistent with what the Secretary has explained in his briefs in this case, that it has sort of always understood the deemed language that's at issue here as being language that's about apportioning regulatory jurisdiction. That letter says that state statute authorizes the online sports betting wages that are in contention here, and it notes that there is some controversy about whether that state statute was validly enacted under the Florida Constitution, but it says that it is not going to enforce Florida law itself and is relying on the representations of Florida government that the statute on the books is valid. When it then goes on to talk about the deemed language, it doesn't sort of squarely say, we don't think that this language is intended to independently authorize gaming in the event that that statute were to fall. But I think right in context, that's because the discussion of that deemed language is all about whether that's an acceptable way to allocate regulatory jurisdiction, and it was and it is. Why should we even look at that letter at all, given that it's a post-decision document? Why does it have any relevance at all to this litigation? Your Honor, I don't think you need to. I think to the extent, you know, it was presented below by the parties, and so I think it is consistent with what the United States has presented to the courts, but we're not relying on that letter in any way, and I don't think that this court needs to consider it in reaching a decision. Now, you mentioned a reversal, but you still have the issue about the tribe being an indispensable party, having an opportunity to intervene, but then still potentially intervening for a limited purpose of asserting its immunity. And I bring that up because you apparently were opposed to the tribal immunity, but in other cases, and even recently in other cases, you have raised that issue. So, Your Honor, I will say that the vast majority of the prior United States briefs that the tribe has presented to suggest that there's, you know, been an inconsistency predate 2012. And the reason that that 2012 date is important is that in 2012, the United States filed a brief in this court in a decision called Ban v. Department of the Interior. I'm happy to provide that brief to this panel if it wishes, in which there had been a dismissal on Rule 19 grounds in the district court because of an absent party, or excuse me, because of an absent tribe that had an interest in the agency action that was being challenged. It was not an IGLAA compact case, but it was another agency action that impacted the tribe. And the district court dismissed on the very grounds that the tribes are arguing for here. And in its brief to this court, the United States said, notwithstanding that we won on that issue, we have considered this issue, and we don't think that that's correct to how Rule 19 works. Now, since that 2012 brief, I cannot, I wish I could, but I certainly cannot represent to you that every single filing made by every lawyer in the Department of Justice has been consistent with that position. I can say that the more recent cases that the court, or excuse me, that the tribe has cited in its brief are factually distinguishable from this case, and I'm happy to go through that in detail if the panel would like. Sure. Sure. So, you know, the most recent one I think that the tribe cites is the district court briefing in the Cerebral Palsy Association decision. And in that case, there was a challenge to government action, but the relief that was being sought was not simply to set aside government action. It was also seeking an order directing the government to take action, to take affirmative enforcement action against an absent sovereign state that had an interest in the action at issue. So I think that the fact that there was that more than just standard EPA relief being sought there, that makes that different than what's the case here. There is no request in this case that, you know, the secretary not only disapprove this contact, but then, you know, start an enforcement action against the tribe or something like that. Another of the briefs that were cited was the Alabama apartheid case from the 10th Circuit. And in that case, that was another one where the relief being sought was not just EPA relief, setting aside agency action, but was actually seeking, the parties were seeking a transfer of property that the tribe had asserted that it had the ownership interest in. Again, that's not an issue here. The other one I think that I would point to is the Humble Action Committee from the Eastern District of California and from the 9th Circuit. And in that case, it was sort of an unusual case in that it was styled as an EPA action, but the United States' position in that case was that there actually was no agency action being challenged. And so when there's no agency action being challenged, the United States' position on Rule 19, which is that it can adequately defend anyone interested in seeing agency action upheld, simply doesn't apply. Thank you. On that Rule 19 issue, I would point out, Your Honors, that in addition to the fact that, as I said, this is the United States' position that it has taken numerous briefs since that ban brief that was filed in this court. But I would also say that I think that that position is important. And I think it's important that this court decide this case based on the merits issues presented by the government rather than the Rule 19 issue. Because the Rule 19 argument that the tribe presents, although the tribe does, you know, its briefs do try to ground that in specific facts of this case, the argument is such that if applied to other cases, it would essentially mean that no one would be able to challenge APA, a federal agency action, that benefits an absent tribe or an absent state or some other absent sovereign that has immunity, unless that sovereign voluntarily waives its immunity, which would be a huge constriction of the APA cause of action and, you know, would essentially render, I don't want to say everything, but substantially everything that the Secretary of the Interior does in the realm of Indian Affairs immune to judicial challenge. So would you suggest that the Seminole Tribe is not required or indispensable part of here, even though it's affected by the compact? Yes, Your Honor, I think the Seminole Tribe undoubtedly has an interest and a substantial one in this litigation. But under this court's precedent, including the Verma decision, which I think is the one where it's stated most clearly, as well as the very recent DeShackle decision from over the summer, it is not enough to have an interest to be declared a required and indispensable party. If there are other parties present in the litigation who are able to adequately represent that interest. But isn't that the challenge, that there was not adequate representation? Well, Your Honor, I think that under this court's case law, there was adequate representation here, and that specifically the times that this court has found that the United States is not an adequate representative in an APA challenge have been cases where the court had significant reason to believe that the United States was not going to defend the agency action at issue. That is not what happened here. The agency has defended the action below. It is continuing to defend the action in this affirmative appeal. Now, the tribe disagrees with some of the calls that we've made in that litigation, and they assert that they would have made different litigation judgments, brought different arguments that the United States did not bring. But respectfully, I think that is not standard that this court has used to judge. And if that is the standard that was adopted, again, I think that goes right back to essentially rendering a huge swath of agency action unreviewable. Is it your view that the tribe has to show some form of refusal? Well, Your Honor, under the Rule 19B analysis, yes, prejudice is essential, and I don't believe that they have shown prejudice here. Let's suppose we had some questions about whether the government was adequately representing the tribe's interests, but if, in the end, we believe that the government prevails, as it hypothetically prevails, and in reverse, for example, shouldn't set aside this agency action, then would there be any prejudice? Well, as a matter of fact, there wouldn't be. Now, it's a little difficult because, obviously, at the time that a court is presented with the Rule 19 issue in the first instance, they don't know what's going to happen at the end of an appeal. And so the question is whether the district court abused its discretion at the time that it made its decision. It didn't know. Certainly, but here we're reviewing kind of the merits of the district court's action and the denial of the motion intervened by the district court. I guess the more artful way to ask my question is, if, for the sake of argument, we agreed with the government on the merits, would the appropriate resolution on the intervention issue be to dismiss that appeal as moot? Your Honor, I'm not sure that it would be the procedural move to dismiss it as moot because, and I'm sure the tribe will make this argument for itself, but, you know, there is a sovereign interest in not having an issue decided in the sovereign's absence, you know, sort of regardless of whether it is decided in the tribe's favor or against the tribe's favor. But I would say, based on the constellation passed before the court at that point in time, I think it would be prohibitive for the tribe to be able to establish that it had experienced prejudice because of it not being treated as an indispensable case. So you think that regardless of how we decide this case, we have to reach the merits of their appeal? Excuse me, I'm sorry, I didn't catch the last part of that. Regardless of how we were to decide this case, we have to reach the merits of the intervention issue? Yes, I think that Your Honor. Seems odd because even with jurisdictional issues, you know, let's say that there's a subject matter jurisdiction challenge in a personal jurisdiction, which is not Article III, the Supreme Court has said, well, we could decide the personal jurisdiction non-Article III jurisdictional issue in order that a case be dismissed and not decide standing or mootness or some Article III jurisdictional issue. So if we can dismiss or turn to the Browns in that circumstance, why do we have to decide a Rule 19 issue? It's not on any greater, doesn't stand on any greater footing than Article III subject matter jurisdiction. That's certainly true, Your Honor. You make a very good point. And I will confess I have not put a great deal of thought into that issue. So I think for the United States part, I would say that, you know, I think that the tribe may be able to address more specifically whether the issue must be reached. And, you know, I think in our view, the most important thing is that the court reverses the decision below and that it does not adopt the Rule 19 analysis presented by the tribe to the state. Census Court believes that it can resolve the issue of resolve this appeal without addressing the Rule 19 issue at all. I don't think that United States objects. Let me ask Judge Travis, I'll let you ask the question. I was just going to say on that issue just a little bit more. Under DECEFO, it says that the adequacy of representation, it should be aligned in all respects, and you should be able to make all arguments on behalf of the party. And we just had a discussion a little bit ago about sovereign immunity issue, not necessarily being raised here but being raised in other aspects. Yeah, so, Your Honor, I think with regard to DECEFO, you know, it does note that, it does say that in that particular case, the absent sovereign and the participating party would have made all of the same arguments. But the case does not say whether that is required. It doesn't address the counterfactual of whether, you know, the present party was going to zealously defend the action and sort of advance the position that the absent sovereign presented. But perhaps they disagreed on, you know, particular arguments which had the most merit, which way to, you know, to present the case to the court. So, I don't think DECEFO stands for the proposition that you have to show that every single argument would have been raised by the party that is participating. And again, I think that that requirement essentially would be, you know, a pathway to finding every entity that's affected by a decision to be a required party. Because there will always be a disagreement among lawyers about sort of what arguments should be brought, what is supported by precedent, what is more persuasive. It's kind of like a coeffective assistance counsel claims where a defendant perhaps thinks the lawyer should raise every argument, but the lawyer has to do some deference or strategy. I think that's correct, Your Honor. And I would point out again that I think, again, this is where this court has affirmatively found that there was not adequate representation. And so, you know, the Wichita decision, the Cherokee Nation decision that are discussed in the brief, the court was very clear that in both of those circumstances, it wasn't a dispute over strategy and, you know, potential scope of arguments. It was, is the federal government actually going to defend this action? And that's our concern here. So can I go back to the issue kind of on the merits of the Secretary's, I guess, deemed approval that subsection, I guess it's 2710, get these numbers all mixed up, I'll just think of it as 8C. You pointed out that it says the Secretary does not approve or disapprove a compact in subparagraph A before 45 days. The compact shall be considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of this chapter. You read of this chapter to mean then consistent with IGRA, but isn't this, aren't we kind of like a dog chasing its tail? Because IGRA above says that the Secretary may disapprove a compact if it violates any other provision of federal law. Or do you, do you think that that's not really circular in that way? Yeah, I don't view it as circular because I think that the prior provision 8B gives the Secretary, it says the Secretary may disapprove on those grounds. But the fact that the Secretary would have authority to disapprove on those grounds, I think is not the same as saying that a compact that could be disapproved necessarily is in violation of IGRA. And I would point to this Court's decision in Almedore County, which, you know, it's sort of... But didn't we say that that may meant shall in that? It did say that the may meant shall. However, it went on to explain in another provision that the caveats listed in 8B are the caveats on the Secretary's authority to affirmatively approve. Whereas the caveat in 8C is the one that applies to the no action scenario. So I think the particular language is the Court said just as the Secretary has no authority to affirmatively approve a compact that violates any of subsection D8C's criteria for disapproval. She may not allow a compact that violates subsection D8C's caveats to go into effect by operation of law. And then the discussion there, you know, the Court was... When it discussed what that caveat was, it was quite clear that that caveat was that there could not be conflict with IGRA. And it specifically contrasted that with an argument that a compact conflicted with the other two conditions that are listed in D8C. In other words, this Court in Honorable County understood that what was being discussed in Section 8C was only one of the criteria that are included in Section 8B. It didn't view that language as sort of sweeping in and including all of the conditions in 8B. And in fact, it couldn't have so thought and reached the conclusion or at least reached the analysis that it ultimately employed. Because the Honorable County Court left open the possibility that with regard to those other two grounds for disapproval listed in D8B, that it may be correct that the Secretary has no authority, or excuse me, has no duty to disapprove affirmatively on those grounds. It couldn't have reached that conclusion if it understood the 8C provision to kind of adopt all of the pieces of 8B. Supply Devil's Advocate, here the Secretary approved by inaction, so to speak. But then we have a post-decisional letter that talks about non-IGRA ground. So isn't the Secretary kind of trying to have her cake and eat it too, although it's a point of cake, you can't eat it. But you see my point? I see your point, Your Honor. You know, I think that the post-decisional letter does correctly cite Section D8C and says that the contract is considered to be approved to the extent it's consistent with IGRA. There are other sentences in the letter that refer to federal law and that discuss compliance with federal law. But again, the Secretary has authority to disapprove for a contract for violating non-IGRA federal law. So the fact, you know, if the Secretary in a post-decisional letter is to discuss those grounds, I think that doesn't show anything other than that the Secretary was, you know, taking the scope of authority seriously. You know, the fact that she's not bound to disapprove on those grounds doesn't mean that she doesn't have authority to consider it, to think about it. Judge Henderson, do you have any questions? No, I don't. Thank you. We know we might have gotten you off track of your argument. We'll give you some time on rebuttal. If there's something that you didn't get to here in the opening that you really feel like you need to say something about, I'll give you a minute or so to do that. Thank you, Your Honor. I think that we will primarily keep that to rebuttal. I think that the main points are simply, as we've said, that the Secretary acted lawfully here. The district court's conclusion was based on an error of federal contract law interpretation, and one flag was much broader arguments should be rejected. And for that reason, the court should reverse. All right. Thank you. We will now hear from Mr. Richard on behalf of the Seminole Tribe of Florida. May it please the Court. I'd like to begin by responding to the question posed by Judge Wilkins as to whether, in the event that the Court reverses on the merits, the Tribe's motion to intervene becomes moot. And I would respectfully suggest to the Court that, although the Tribe would be very pleased if the Court reversed on the merits, that it would be a reversal of the proper order of the analysis. The lower court never should have reached the merits, and the initial error of the lower court was to fail to even consider the Seminole Tribe's motion to intervene. Had the Seminole Tribe properly been committed to intervene in the case and dismissed on sovereign immunity, it would not be a merits issue. And sovereign immunity, as this Court and the U.S. Supreme Court has told us, is the overwhelming issue in a Rule 19 question. So, again, while we would be pleased if they reversed on the merits, we believe that the first question should be the question of the Tribe's immunity, and the lower court's error with respect to that immunity. I understand that on one level, but as I mentioned in the argument with your friend Ms. Tarrin, even with Article III subject matter jurisdiction, which is a foundational issue for us, we can neglect to reach that to dismiss a case on a non-Article III personal jurisdiction. The Supreme Court is blessed with that. So, why should this intervention issue be different just because it raises sovereign immunity? Well, I understand the question that your Honor is struggling with here and respect it, and the Tribe doesn't have a strong position on this. I just mentioned what we believe is the appropriate analysis here. How would the Tribe be prejudiced, if at all, if, assuming for the sake of argument, we ruled as the government would like us to with respect to the merits of the APA claim, and we, I guess, dismissed your cross-appeal or your appeal as new on the intervention? How would you be prejudiced? Well, we would be prejudiced because, as this Court has said, the issue of immunity is a compelling issue in itself, and it's important to the Tribe that its immunity be protected in this case. The District Court has ruled that its immunity, for reasons that are not sustainable, is not to be respected. So, the Tribe would be prejudiced because of the undermining of Tribal immunity that would result. In that instance, that's how we believe it would be prejudiced. Approving the compact, though, doesn't undermine the Tribe's immunity, right? Well, I think it would undermine it in this case. And the IGRA itself is a waiver of Tribal immunity to the extent that it provides a cause of action with respect to these gaming compacts, right? That's an interesting point, because IGRA waives Tribal immunity in very limited instances, and the presumption is it didn't intend for it to be waived in any other instances, and we're not dealing with one of those limited instances in this case. And again, going back to my original point, the Tribe's immunity should have been the first consideration by the lower court, and the lower court carried by failing to do that, and we believe that that issue is worthy of first consideration. Having said that, this is not a major point in this case for the Tribe. And if this court decides to reverse the merits, the Tribe will not have heartache from it. But we believe that the prejudice comes from failure to support the importance of the immunity being respected as the first consideration by the Tribe. As I noted, this court and the Supreme Court have held that Tribal immunity is the overwhelmingly significant issue, and it is to be given primary consideration. The district court gave it little or no consideration. The court engaged the plaintiff in a lengthy dialogue regarding the merits of the summary judgment motion. It took considerable time to castigate the Department of the Interior for failing to initially brief the question of the merits, and it refused entirely to hear from the Tribe before it issued a summary judgment destroying the Tribe's most important asset. So the court, contrary to what this court and the Supreme Court have instructed, gave practically no consideration to the issue of immunity. Can I just ask one question before you move on? Sure. Are you aware of any authority that says that an intervention motion such as the one brought by your client has to be reached first before dismissal on some other grounds? I think it has to be addressed when you say first. I mean, I think the court could certainly have engaged the parties in a discussion of the merits first. That's within the discretion of the power court. But the court can't just cast aside the immunity issue because this court and the Supreme Court said that's the predominant issue. Well, I guess here's what I'm getting at. Maybe a better way to ask it. If the district court is just trying to be practical, and let's suppose you had a case where the district court thought that the APA challenge was easily disposed of because it had no merit, but it thought that the intervention motion and the sovereign immunity issue was difficult because of the public rights issues, et cetera, and the district court just said, I really just want to put the intervention to one side and focus on the merits and rule that way, and then deny as moot the intervention motion. I understand that you think that that's the wrong way to proceed. Why isn't that a practical way to proceed, or what case says that you shouldn't do that? Well, there would be nothing wrong with it other than what I said initially. If the trial court had decided that it upheld the compact and then ruled that the motion to intervene was moot, but she struck the entire compact, even more than the plaintiffs were asking for, and then refused to address immunity, and that's error. And I don't think there's any way that error can be disregarded, given what this court and the district court has instructed, and numerous other courts have instructed. You can't just disregard the immunity issue and issue a summary judgment for the prejudice of the absent party. That's what Pim and McHale called us. You cannot adjudicate a significant interest of the sovereign party in its absence, which is what the court did here. Now, with regard to the 19B, the question is- What about the arguments by the government that that would make bigger challenges under the APA pretty much impossible, absent waiver of sovereign immunity by a tribe, with respect to review of a compact? Well, first of all, that's really not true. There certainly are cases in which an agency can adequately represent the interests of the absent party. But this certainly is not one of them. This doesn't even come close to the line. For example, the court found that there was adequate representation here. But in the department's motion to dismiss, in this case, the department said this, that the secretary had no role and continues to have no role whatsoever, and that was in italics in the motion, with respect to the compact or how it might be implemented. And, in fact, in this case, the department took the position that the only thing that it had to defend was the propriety of its administrative conduct, and it didn't extend to whether or not the compact was appropriate. It continues to take that position. And it can only address the merits when the trial court ordered it to do so. That in itself should be enough to determine that the department cannot adequately represent the tribe. But doesn't that depend on us agreeing with you that approval of the compact under HEDRA also means that the secretary is saying that it complies with state law? Well, I have to agree with the department in the council's response to that. That's what I thought. So I guess I'm failing to see how what the department said in its motion to dismiss was really kind of against the interests of the tribe. Well, the fact that the tribe and the department agree on one particular aspect of the case doesn't mean that the department is competent to adequately protect the interests of the tribe. The decision, incidentally, which is made at the beginning of the case when the motion to intervene is considered, in this case, the department not only took the position that it had no role whatsoever once it made a decision as to whether or not the compact should be approved, disapproved, or allowed to take effect without approval. And it can, by the way. It's not the first time that that's happened in PPI versus CHEMFOR. In 2008 in the Northern District of Florida, the department, in that case, they said the secretary's role in the HEDRA approval process precludes it from adequately representing the Seminole tribe of the state of Florida. There they took the opposite position. They said that because they should have taken no action and were neutral, they could not adequately represent the tribe. So they reversed its position, which raises, in fact, what this court said in Sharkey versus Saville, where they said that the department could not adequately represent the tribe, having reversed its position two times over the previous period of years. Now, what we are saying, if we permit this, is that the department has the authority to decide whether or not a tribe has immunity by the position that a particular administration decides to take. And it doesn't have that authority. Only Congress has the authority to abrogate a tribe's immunity, not the department by virtue of whether or not it's But, I mean, that's the way that Rule 19 and Rule 24 kind of work together to the extent that, I mean, you're not arguing that because the tribe has sovereign immunity, there are no circumstances whereby the government can litigate and adequately represent the tribe. The tribe always has to be a party. It's always a necessary and indispensable party. You're not arguing that. No, I'm not arguing that. I think that there are cases in which they can be adequately represented. I think that they say, well, the case is a good example. That didn't involve an Indian tribe. It didn't involve another sovereign entity, which was the country of Hungary. In that case, I think the court properly found, this circuit properly found, that there was adequate representation. But in that case, they laid out the facts to show that the agency involved was effectively the alter ego of the government. In 20 years, they've made all these decisions regarding the artworks that were issued in this case. They had virtual identical issues, and we're far from that in this case. In this case, if you say in this case, with these facts, that the department is an adequate representative of the tribe, then what you're saying is you're providing a roadmap to a plaintiff to do exactly what this plaintiff did, which is to sue only the Department of the Interior, not sue the real parties in interest. And consequently, you cannot. They have single-handedly defeated the sovereign's immunity. And you're also saying, as I said, the Department of the Interior gets to make that decision by what position they take in the case. And I think that that's contrary to everything that this court and the Supreme Court and other federal courts have said about immunity. I'm not sure I understand the roadmap argument. I mean, in an APA case, secretary or administrator of the agency is always the dependent and usually the only dependent, right? What roadmap was provided by the secretary here that, you know, a good lawyer wouldn't have already figured out? This extends beyond APA cases. What you're essentially saying is that a plaintiff, just by naming an agency, a federal agency, can lift or abrogate the sovereign immunity of the absent party, even when that party's substantial interests are at work, because that would be the effect of this holding. It wouldn't be limited to APA. The only difference with APA is that the secretary is generally, or some agency, is generally the dependent in the case. There's a much bigger issue before us here, which is who it is that's going to be able to abrogate the sovereign immunity. I see that my time is up here. Well, we may have derailed your presentation some. I'll see if Judge Childs, you have questions. Yeah. Judge Henderson, do you have questions? No, I don't. You really derailed it early for a question. I think you asked exactly the questions I wanted to answer. Thank you. All right. Thank you. We'll give you some time on rebuttal. All right. We have up next, I believe, Mr. Whittaker for Amicus Judi State of Florida. Morning, Mr. Whittaker. Morning. Thank you, Your Honor. Judge Wilkins, you asked some questions about whether the court needs to get into issues of state law. Obviously, the state is here. We stand ready to address those questions. But I do agree with my friend, Ms. Herent, that you don't need to. And just to add to the response to Your Honor's question, there was some discussion of that HC provision. Your Honor asked about the provisions of this chapter. He struck me concerned. And I think to add to what Ms. Herent said, the provisions of this chapter in that section is talking about substantive issues. It wouldn't include, I think, subparagraph B, which is inapplicable here because this is a deemed approval. And as Ms. Herent pointed out, this court in Amador County grounded judicial review of a deemed approval expressly in the language of subparagraph C. And it is indeed true, as Your Honor pointed out, that there also was some discussion of subparagraph B. But I read the court's discussion just to illustrate, generally, that HIDRA does provide, as a general matter, law to the plot. It's not saying that for every deemed approval, you necessarily have to, in a 45-day period, verify compliance with the entire universe of federal law. And certainly not state law, which, of course, is not mentioned not only in subparagraph C, but is also not mentioned in subparagraph B, which I think is quite significant. Even if you're not going to have to go with the universe of federal law, if there's a specific complaint or issue lodged, would you not at least have to address that? I don't think you would have to address that, Ms. Childs, in the context of a deemed approval. And again, I think that the language in subparagraph C is tied to substantive provisions of HIDRA, which would not themselves turn from the content of state law. Now, my friends from Montero, of course, have raised the question about whether exclusivity provisions implicate 2710D, paragraph 1, subparagraph B, which does turn on state law. But that provision only goes to whether the gaming is lawful. That doesn't go to whether a compact is valid as a permissible subject of a compact. So that is not an issue here. Again, HIDRA provides for gaming to be lawful. You need three things. You need tribal resolution. You need state law to, in some sense, authorize gaming. You need a valid HIDRA compact. We're only talking about the compact step of the analysis here. And that question is governed by the list in HIDRA, the permissible subject of an HIDRA compact. There's no question that our compact, quote, governs gaming on Indian lands. The vast bulk of the compact expressly and indisputably concerns gaming on Indian lands. Let me just ask a hypothetical. I should have asked it to Ms. Aaron. But since we're talking about this, let's suppose there was something in the compact that was kind of blatantly constitutional, but yet unconstitutional, but yet the secretary didn't act and it was deemed appropriate. So let's suppose the compact said that, you know, at the casinos and in the one-line betting, only people of a certain race will be able to partake in the gambling activities and others cannot. And let's assume, for the sake of the hypothetical, that that violates the Equal Protection Law. How would that, if the secretary deemed that compact true, how would somebody challenge that? Or could they challenge that? We're not disputing that subparagraph C would preclude review of constitutional claims. I guess I was only talking about non-HIDRA statutory claims. Obviously, there's a clear statement of requirements that preclude review of constitutional claims. And certainly this is more of a bailiwick of my friend Ms. Aaron, but we are not contending that review would be precluded of that kind of claim, although we have not taken a position on the Equal Protection claim that's at issue in this case. So before I sat down, I did want to address briefly the question of remedy and partial or vacater in this case, which is an issue that only we're raising. And just to underscore that, that's a very important issue for the state. It's worth $2.25 billion to the state of Florida over five years, because even if Judge Friedrich, everything Judge Friedrich said on the merits is correct, she made a serious mistake in failing to partially vacate the rule, not just because there is probably the most express severance provision you've ever seen in your lives in the compact specifically directed at this court's vetting group, but also because this BC language, the predicate for judicial review in Amador County, contains language that screams out for partial vacater, insofar as it provides for deemed approval to be valid, quote, to the extent the compact is consistent with the provisions of this chapter. And contrary to the district court's reasoning, nothing in Amador County would suggest otherwise. Obviously, Amador County didn't reach the merits of that case, of that at all. And, in fact, its reliance on that very provision, I think, screams out that this court's normal partial vacater precedents apply with K4-SHARE-I in this particular context. I see that my time, my short time has expired. I'd be happy to answer any further questions the court might have. None from Judge Childs. I see Judge Henderson. No questions. All right. Thank you, counsel. I appreciate your participation. We'll now hear from counsel for appellees, Mr. Hume. Thank you, Judge Wilkins, Judge Childs, and Judge Henderson. And may it please the court, Hume is humed for the West Flagler appellees. The compact in this case negotiated by Governor DeSantis and the Seminole Tribe purports to give the Seminole Tribe a statewide monopoly over online sports gambling in Florida. It expressly, by its terms, authorizes the tribe to offer such gaming to persons located anywhere in the state, whether the gamblers are located on or off Indian lands when they place their bets. AGRA does not authorize the secretary to approve such a compact. Instead, it required the secretary to disapprove that compact because it sought to authorize gambling off Indian lands. And that is a direct consequence of both AGRA's limitation to Indian lands and this court's decision in Amador County v. Salazar, the 2011 decision by Judge Cato. The government concedes that AGRA cannot authorize gambling that takes place off of Indian land. Then why isn't that kind of dispositive? The government says that it's disclaiming that it's authorizing what you think that this compact authorizes. Because, Judge Wilkins, they're trying to have it both ways. They're asking this court to reverse the decision of the court and hold that AGRA approves the compact that authorizes gambling off Indian lands. Even while they say in their legal briefs that AGRA cannot authorize gambling off Indian lands. This doesn't make any sense. What they're saying makes no sense and is going to be a cruel joke if this court accepts the argument. Because they are saying, we don't admit, and they have to under Amador County, that AGRA does not authorize gambling off the Indian lands. You can still reference it. You can address it. You can squeeze it in there. We're not authorizing it. No, no, no. Well, what is it then? It's going to be part of an approved AGRA compact. AGRA only has one approval provision, 2710 D8A. And it says the secretary may approve an AGRA compact that authorizes and governs, that's the key word, that governs gaming on Indian lands. That's it. There's only one approval. There aren't multiple approvals. There isn't a big capital A authorization approval for the Indian lands. And all this little kind of wink, wink, nudge, nudge approval for off Indian lands. But it's not going to provide any sort of race judicata or collateral stuff or any other preclusion from you making that argument in Florida State Court. Your Honor. Right. Your Honor, I don't know the wording of the state court. I don't know what arguments we're going to make. They're going to raise all kinds of immunity. The reality is the express terms of this compact, authorize gambling off Indian lands under it. Well, they'll argue immunity. But, I mean, the Supreme Court has made clear in the Michigan v. Bay Mills that, you know, you can get around that by suing tribal officials, by, you know, seeking injunctive relief against Florida state officials, all sorts of other ways. I mean, to the extent that if it violates Florida state law, you're not without. Your Honor, whether it violates Florida's state law directly and unambiguously depends upon whether it is part of an approved agro compact. So they're trying to get you to send us back to Florida with an agro compact that has the giant rubber stamp saying approved under agro. And then they're saying, oh, but then he's going to say that violates state law. If you are remotely tempted to accept that argument, I beg you, make it crystal clear that the order says this secretary's approval does not, in any way, authorize the gambling that takes place off Indian land, which is equivalent. Such an order would be equivalent to what Mr. Whitaker just suggested to you, which is a partial negative. This compact can be approved in every respect, except insofar as it seeks to authorize gambling off Indian land. If they think that's legal under state law, then let them take the position it's legal under state law. All we're saying is don't give them the imprimatur of an agro approval because they will use that to say that it satisfies state law. That's what's going on here. There's nothing remotely ambiguous in this compact. It does not seek, it does not reference gambling off Indian lands as something that is legal under state law. It says in Part 4, which is entitled Authorization and Location of Covered Games. This is on page 692 of the Joint Appendix. There's actually two versions of the compact in the appendix, so it's also on page 76. First sentence, first substantive provision after all the definition. The tribe and state agree that the tribe is authorized to operate capital CG, cover games, a defined term, on its Indian lands as defined in EGRA in accordance with provisions of this compact. That's it, authorized to do covered games on Indian lands as defined in EGRA. And then the very next sentence says, wagers on sports betting and fantasy sports made by players physically located within the state using a mobile or electronic device shall be deemed to take place exclusively where received at the location of the servers or other devices on Indian lands. It is a construct to satisfy EGRA. That's it. You would have to willfully blind yourself from what this compact says to accept the government's arguments. On page 687 of the compact, it defines covered games to include sports betting. Sports betting is defined on page 687 of the journal appendix. It says all such wagering shall be deemed at all times to be exclusively conducted by the tribe and its facilities, including any such wagering undertaken by a patron physically located in the state but not on Indian lands using an electronic device connected to the Indian lands. It's expressly said that the gambling that is off Indian lands is going to be treated as if it was on Indian lands so that it may be approved under EGRA. There's nothing, no other way to read it. And the reason it doesn't happen in that sort of language is not like unique to this case or the first time that it's come up in one of these compacts. I believe it is. I thought that there was some reference to compacts and tribes or retrieves in California that had analogous typing, but I'll go back and check the record. Maybe my recollection is off. Or maybe mine is because I'm not. But what I'm remembering is the tribe references and footnote compacts with the state of Nevada, three different compacts with the state of Nevada, which talk about gambling both on and off the reservation. But there, first of all, all it does, those compacts that say you can do the gambling on the reservation, that's legal off the reservation and cites the state law. Of course, in Nevada, gambling is legal everywhere. It's very, very different. I'm not aware of a construct like the one here that's been presented for approval to the Secretary. In California, they tried, one of the tribes tried to offer bingo over the Internet. And that's the EPA case in the Ninth Circuit that held that could not be squeezed into EGRA because it did involve gambling off Indian land. So that case supports us. And I believe the United States government took the same position there. And in the Coeur d'Alene case, that when you have gambling over the Internet, the gambling takes place both where the bet is placed and where it is received. That's the U.S. government's position, which is why they can't accept this construct under EGRA. Not only is it transparent what it's trying to do, but they agree in other cases that the gambling takes place both where the bet is placed and where it's received. So this contract does, in fact, authorize gambling off Indian lands, which EGRA doesn't permit. The Supreme Court says everything, literally everything in EGRA is about gambling on Indian lands. And this court's Ann Arbor County decision clearly says you can't have a contract authorizing gambling that's not on Indian lands. Imagine a case where Ann Arbor County just beat the facts slightly to say there are two decisions. One on Indian lands. One on indisputed Indian lands. One on the land on the red chair in that case where it was a dispute whether it met the definition of Indian land. And then imagine they just said, yeah, but they're related because we're going to have the same back office operations for both. You get to squeeze in Crowbaril, the one that's off the reservation, into the contract. You cannot read Ann Arbor County's allowance for that. So, Your Honor, we do not think you need to resolve a state law question to affirm the district court. And the district court quite clearly did not, when I was her witness, say she's not making a ruling on state law. And the reason you don't, I just want to do my best to try to explain this, is on the face of it, the only thing that can be approved is a compact governing gaming on Indian lands. This compact supports to govern gaming both on and off Indian lands by express terms. It governs it, it authorizes it, and it seeks favor of approval for it. And as a matter of federal law, you can't do that. Now, I want to be clear that that's why it begins and ends with that you don't need to do a state law. By the same token, this whole scenario of having to bind yourself to state law is a bit misleading. If the federal law that the secretary has to determine whether it complies with, and this court in Ann Arbor County on page 381 says all three provisions in 2710E8B allow for disapproval, the secretary must disapprove if she concludes that anyone is violated. And that includes federal laws like the Wire Act and the Unlawful Internet Gaming Enforcement, UBGA. Both of those acts, their violation depends upon what's going on in state law. So to determine a UBGA violator, the secretary does have to look at state law. And there's no case that says when the federal law approval turns on a question of state law, the state agency must throw up their hands and the court must throw up their hands and tell them that they have no competencies over state law. That's just not correct. You are able to look at state law, and we don't think AGRA requires you to look at state law. You can only have a contract that authorizes gaming on Indian lands, something other than the contract has to deal with gambling off Indian lands. But if this court disagrees, and some of the arguments seem to suggest that the AGRA approval may depend upon whether it's legal under Indian lands or not, whether the gambling off Indian lands is lawful or not, is a question of state law. If the court thinks it has to address state law, then the court can look at state law. And it is unambiguous here in Article 38 of the Florida Constitution that the gambling off Indian lands is not lawful unless it is part of an AGRA contract governing gaming on tribal lands. It says on tribal lands in the Constitution. So it bounces you right back to AGRA. The only way it can be legal under state law is if AGRA authorizes it, and AGRA doesn't authorize it. What of the Florida Supreme Court advisory opinion? The advisory opinion on the constitutional amendment, that's the question about? Yes. I don't think, I think that we think the way that was presented in one of the briefs was quite misleading. I think we would ask the court to look at the actual decision in the advisory opinion, which makes clear that it is not saying anything different from the Constitution. It is saying the only, everything requires a reference, including sports betting, which is clearly Class III betting, number one. And the only thing that it's saying is carved out is something that is approved as part of a valid AGRA contract on, for gaming on tribal lands, which is the language in the constitutional amendment. And it wanted to make the, the advisory opinion is in Florida, the process is essentially to make sure the proposed referendum is not misleading. That's the job of the Supreme Court in those advisory opinions. And I think that it's simply saying it's not misleading because it's clear that the only part of here is an AGRA contract for gaming on tribal lands. So, I can't remember the precise turn of phrase they quoted that we thought was slightly misleading, but I think we felt strongly we should go back and look at the actual context of that. It's helpful to us, not to them. So, just to make sure that I have your argument correct, you believe that to the extent that the compact says that activity, gambling activity that is not taking place on tribal land, like they get from an app on a phone, is sitting at someone's home in Miami or Tallahassee or someplace that's not on a reservation. To the extent that the compact tries to say that that can be deemed to have occurred entirely on tribal land, or servers on tribal land, that that violates AGRA because, not because it violates state law, but because it violates what? It violates 27108A in the sense that it goes beyond what the Secretary can offer. If the word violates AGRA, we would agree with it. Perhaps it would be clear, if I would say it this way, that it goes beyond what the Secretary can authorize under AGRA. It goes beyond what a compact can authorize under 2810D1A. Both of those provisions, D1A and D8A, make clear that what the compact can authorize and what the Secretary can approve is only the compact authorizing gambling on Indian lands, not on tribal lands. And why is it that the Secretary can't say, well, we have lots of laws or situations where it's unclear how we're going to construe who has jurisdiction over the transaction.  State sales tax, that sort of thing. And statutes are drawn to deem a transaction to have occurred in a certain way. And as long as they don't violate the Commerce Clause or something, the Full Faithful Credit Clause, that can be done. So I'm just trying to understand, what is the source of the organic law that you're saying that this violates, this deemed to have occurred? What exactly does it violate? You're saying that AGRA itself says that you can't deem something to occur on Indian land in this fashion? Is it Florida law? Is it some other federal law? What is it? I understand the question correctly, Judge Wilkins. I think it is the same answer that paper doesn't authorize. I want to get to some more penetrating questions. I want to make sure I get to that. Paper doesn't authorize the gambling that takes place off the land. And I think the question then is, well, what enables it that you can't accept this contract, this deeming? When AGRA says you can't accept the deeming, has someone just treated it as if it's gambling on AGRA lands? And I would say the same convenience to say that, because there's nothing in AGRA that could allow for such a brazen re-characterization of the actual facts. There's no dispute what the actual facts are. The person with the device in Miami or Tallahassee or anywhere in the state can now place bets. So there is gambling. But there's no factual dispute. As a matter of law, as I said, and I think this is in reference to note 13 of our brief, the United States government has taken the position that gambling takes place both here in the better place than received. The Ninth Circuit had that same conclusion in the EPA case. So as both a factual matter and a legal matter, you can't re-characterize all the gambling as if it's on Indian land for AGRA authorization. Now, I'm going to also raise the question of whether, well, can't they do it for other purposes? Can't they do it just out of the jurisdiction and make sure they know who's regulating what? That is a legal argument they've made to try to defend it. That should be rejected as a matter of law for a number of reasons, including that there's nothing that that deeming actually does that helps clarify anything about the regulation and jurisdictional issues. If you look, I would ask the court to look at the 110694-717. Twenty-three pages of this contract discuss things like allocation and jurisdiction and who regulates what. And not a single provision there turns upon the deeming language. It does not cross-reference. It would all make sense without the deeming language and that the deeming language doesn't change any of it. And those are the sections that deal with rules and regulation, patron dispute, workers' comp, court claims, limiting consent to student, state monitoring, jurisdiction, licensing. None of those provisions turn upon this deeming language. So if you look at it, there's no way to understand it other than that the deeming language is an effort to get around the April limitations that only authorize deeming on union lands. And the reason they want to get around those limitations is because of the fact that otherwise they would need a citizen's referendum, which they don't have. And so the court simply needs to look at what's actually happening. Even the incoming legislation that makes no pretext of authorizing this gambling off union lands as a matter of state law independent of it. The incoming legislation itself says that this contract is only lawful for the whole thing if it's approved under it. It doesn't say, by the way, you can put a server off the union land and off sports gaming. There are some tests. You now have a monopoly on sports gaming. We know that for gambling on union lands, you have to go get a neighbor approval and a contract with an approval. But for the gambling off union lands, you can just do that. Green light. It doesn't do that. Because it knows the only world's test here has to be to have the whole thing approved by the neighbor. And so if you look at page 754 of the appendix, it says, if the gambling contract is not approved by the secretary, you go back to the old contract. If you look at page 756 to 57, it says, here's the gaming we're authorizing. Here's the specific categories of gaming. And this is authorized. It says, for purposes of satisfying tenure, the gaming activities authorized under the gaming contract are as follows. Pursuant to the contract. So it's only, it says it three times, that the only way it's authorized is because it's in the contract. And then when it lists the gaming, on page 757 of the appendix, it lists fantasy sports and online sports with the gaming language. Again, it's the only way it can be authorized. Because it is deemed to occur on Indian land. Your Honor, my time is up. I'd be happy to address other questions. If you can just touch on the motion to dismiss with respect to the merits and then the arguments that we've heard here today about the intervention Yes, thank you for the opportunity to do that, Judge Tiles. Obviously, we agree with the United States that the court correctly rejected the 119 motion. I would maybe add just a couple of points the government did not make. The Disappel case is the key case from this one. I don't know if I'm pronouncing it correctly, but the Hungarian case, Disappel, that's a fatal decision. On page 748 of that decision, that page 1, refutes everything the tribe is arguing. They say, once you have a sovereign, an absent sovereign, some interest, that trumps everything. If Disappel says no, it doesn't. It just means you look at the other four factors and maybe don't go beyond those four factors in the 119B. And then it very quickly goes on and says, if you're adequately represented, that deals with prejudice. And what they rely on are a few cases that I really want to emphasize, implicate a foreign sovereign, an absent sovereign's immunity, far more severely and directly than is the case here. In the Pimentel case, you have an interpreter by Merrill Lynch, as a part of mine, saying, we don't know who owns this. The human rights victims represented in the U.S., the human rights victims represented in the Philippines, represented in the group for the Philippine government. Maybe a fourth was the Marcos family. The Philippine government was a potential claimant on this pot of money. And so there's a direct excuse. Do they get the money or not? And in that scenario, you can see why the absent sovereign, they're not going to represent their interests because everyone else in the interpreter wants the money themselves. It's a very, very, very different case. In Pikapu, in this court's decision in Pikapu, the prized student, the secretary of the interpreter, had to declare a contract valid after the Kansas Supreme Court said the governor didn't have authority to enter into that, to bind the state. The legislature had to approve it. The legislature did not approve it. So there, they're trying to bind the state to a contract if the Supreme Court said it couldn't legally redoubt it. I think the point is, even in this account, there's a form of direct interest where the hungary is saying, we own the property. We own it. Not this asset manager. We do. And so here, the question is, we're not trying to impose any allegations on the tribe. We're not trying to take property of the tribe. We're simply challenging the federal approval that everybody agrees is a prerequisite to make this contract valid. I understand why their interests are implicated, but it is not the same as a direct pat on their sovereign, their sovereignty and their sovereign immunity. There has to be an APA cause of action to challenge agency action, and I do think their argument would preclude it in all other cases. I think implicit in Andorra County is that given that this court has a duty according to state law to be equipped to raise, to respond to, Rule 19 problems, then it shouldn't have been raised in Andorra County. And it wasn't. In fact, when the tribe showed up later to say it was a necessary party, it was deemed to be untimely. Mr. Hume, I don't have a question so much as I guess it's a comment. I don't know if your resistance is intentional, but it seems to me that your argument is simply that DOI has either taken an ultra virus action or it's reading is, I know we don't usually say it's ultra virus, but it's unauthorized. That's it, right? Judge Henderson, I appreciate that. I think it is. I'm not sure why I was resisting on that. Well, there's a lot of talk about ultra virus, and it has a very narrow application. I don't think I agree with that. I have the traditional interpretation of it, which is if an agency doesn't have the authority to do something or read something a certain way, that's ultra virus. And that's how I see your argument. And I agree with that, Your Honor. That is what we're saying. It's not the Secretary's approval whether it was deemed or whether it was an actual does not, is not authorized by any other statute that authorizes the approval. 2710 DAA does not authorize the approval of the contract. That is already an expression for medics gambling off Indian land. Right. Thank you. Thank you, Your Honor. All right. If there's no other questions then, Judge Henderson? Yes. No, I don't have another question. All right. Thank you. All right. Thank you, Mr. Hume. Thank you. And now I believe we will hear from Ms. Reed on behalf of Amethyst Curiae-Fonterra and other parties. May I please report? Jenea Reed on behalf of the Gambling Opponent Committee. Contact between the Seminole Tribe and the State of Florida was a blatant and run-around in the Florida Constitution. And for that independent reason, the District Court properly vacated the contact in its entirety. Amendment 3 to the Florida Constitution was a seminal shift in Florida law. Florida gaming law provides generally a prohibition against gambling. And the legislature has, on occasion over the years, allowed some very limited exceptions to that general prohibition. But in 2018, the people of Florida overwhelmingly decided to take that authority away from the legislature. In fact, more than 71% of Florida voters who voted on the issue decided that a citizen's initiative would be the only mechanism in which you would be able to authorize expanded casino gambling in Florida. There is no dispute here, sports betting, that that issue here was not allowed and was not approved through a citizen's initiative. It was illegal in Florida. And for that reason, the Secretary was required to disapprove the compact. You've heard today some arguments in connection with AGRA and off-reservation, allowing gambling off-reservation. That violates Florida law as well, but it also violates AGRA. And AGRA does not allow a compact to be used to allow gambling that is otherwise unlawful in the state. AGRA itself provides that the gambling must be lawful in the state, and here it was not. Sports betting was not lawful. And there's other provisions with respect to the compact that it supported to authorize that expanded gambling and gave it to the tribe that no one else in Florida lawfully had. That was error, and to allow the Department of the Interior to get away with not disapproving a compact that violates the law would set precedent that is inconsistent with MDOR. What is your position as to what we, or the district court, should have done? Certify the issue before the Supreme Court? Here, I don't know. Our position is not that you would need to certify the issue to the Supreme Court. The district court properly found that the compact violated AGRA. And independently here, it also violated state law. And state AGRA requires and specifically references state law. And so it was required to look at that. Now, you know, the Department of the Interior has suggested that this is speculation in connection with Florida law. It is not. It was clear on the record. Specifically, there were letters submitted to the Department of the Interior at JA645, JA663, that put this issue about amendment three specifically before the Department of the Interior. And so it was not allowed to ignore the fact that AGRA requires the ban to be lawful in Florida. And it was not. It plainly was not. And the Department of the Interior was required to look at that. Now, in terms of, you know, certifying to the Supreme Court, that is not necessary. But we think it's clear from the face of the amendment. The amendment itself states that it's voter control of gambling in Florida. That's the title of the amendment. It's clear on its face. And it's not disputed that that's the amendment and that that is what it provides. And for that reason, the district court should have, the district court properly vacated the compact in its entirety. Thank you, Kelsey. All right. Ms. Heron, I know that you were out of time, but why don't you take four minutes for your comment. Thank you, Your Honor. So, Your Honor, in the brief time that you've allowed me, there are three main points that I want to make in addition to addressing any questions that have come up for Your Honor throughout the course of the argument. And the first is with regard to West Flagler's, the null of their argument about why there is a, why the Secretary violated ABR here is this idea that there's an attempt here to have it both ways. There is not any ability as a matter of law to have it both ways. The language that's at issue in the compact, the deemed approved, or excuse me, the deemed language in terms of deeming to occur on Indian lands. The Secretary has explained can be lawfully read to mean that it is being deemed to occur on Indian lands for the purpose of deciding regulatory jurisdiction, which no one has suggested would be improper. That is a lawful reading. The alternative reading... But that reading is in something that you said that we shouldn't even, or isn't even really properly before us, because that's not in the decision. The decision was just simply, you know, the passage of time. Yes, Your Honor, and I want to be clear. We're not relying on that letter. And the reason is that the Secretary in a no-action context still didn't approve the decision. So this isn't a chainery kind of situation where we're looking for what the Secretary's reasoning was. That's not an applicable framework. What we're doing is looking, as a matter of law, at whether this compact violates law. Here, this deemed language, we've said on the brief, there is a reading that is permissible, and there is a reading that would be unlawful. That is, to understand this deemed language as saying that it is occurring on Indian lands for purposes of IGRA, such that state law is no longer relevant. That second reading, to be very clear, is unlawful. That would not be an appropriate reading of this. Under that reading, that language would violate IGRA in that the Secretary would be exceeding authority. When you have a situation where you have one possible reading of a compact term that is permissible and one that is unlawful, federal contract law, which everyone agrees applies here, says that the lawful one governs. For that reason, the proper reading of this compact, under those principles, is that this lawful reading is the one that it controls. To be very clear, if there is some concern that the state or the tribe may try to turn around in some other proceeding in Florida and say, well, no, that's not actually what it means, I do just want to point out that, first of all, the federal government has been clear in its litigation that this is what it understands that it means and that an alternative reading would be unlawful, and that's something that the tribe and state would have to contend with. Second, the tribe and the state have told this court in its filings as amicus that that is not what they understand the compact to do. So I don't think it is fair to lightly assume, and the United States would not want to lightly assume that those two sovereigns would then turn around and say something contradictory to another court. And the other thing is that simply as a matter of law, it doesn't really matter what the hope or intent may have been because the correct legal reading is the one that is permissible, and that reading is one that is a valid reading of the compact for the reasons that we lay out in the brief. Under that reading, I want to be very clear, the deemed language does not serve no purpose. The deemed language makes clear that all of those general provisions of who will have regulatory jurisdiction that counsel for what slide will reference apply to gaming off Indian lands, and it's important, I think, that the compact would be clear about that because normally a tribe would, of course, have no authority to regulate things that are going on outside of its Indian lands. So, Your Honor, I see I'm out of time. One of the other points I wanted to make went directly to a question that you raised, Judge Wilkins, to the extent you would permit me a moment to answer that. So, you had asked, imagine a hypothetical compact that was blatantly unconstitutional on its face that said only people of certain races would be permitted to engage in gambling, and you said, what's the recourse if the Secretary took no action there? And I would say in the first instance, the main recourse is that, I think, the government is entitled to a presumption of regularity and that I don't think there's any reason to assume that the Secretary would take no action in the face of something that was blatantly unconstitutional on its face. Here, the constitutionality argument that Webb Slagler has referenced is far from something that's blatant on its face. As we've said, it's simply a nonstarter under the relevant constitutional precedent. And the other point I would point out is that even in a situation where the Secretary did take no action, there would still potentially be claims that people could bring that the state had taken an action that violated their constitutional rights. And the fact that a compact is approved through an action does not do anything to insulate such claims or to render conduct that may actually violate the constitution. It doesn't turn them lawful by dint of approval. For all these reasons, Your Honor, I would again say that the compacted issue here can be read lawfully. No one has presented a problem with the lawful interpretation of that compact because it can be read lawfully and as a matter of federal contract interpretation, that is the lawful reading that governs. And in that situation, the Secretary was not compelled to adopt an inferior reading. And so she had no duty to disapprove a compact on these facts. Thank you, Counsel. Mr. Richard, if your time was up, I'll give you some time as well. If you want it, I'll give you three minutes. Thank you, Your Honor. In response to the argument by the plaintiffs attempting to distinguish a number of the cases that have upheld the importance of immunity for fraud, that argument misses the core issue. What those cases consistently held was that immunity is the overwhelmingly predominant question in the Rule 19b analysis. And that, in turn, goes to the first question that I responded to from Your Honor, Judge Wilkins, which is this. For over 100 years, the United States refused to recognize the sovereignty of Indian tribes, took the United States Supreme Court to correct that, and even attempted to correct it, the United States failed to abide by that ruling for decades until the federal courts finally gave the tribes the respect they deserved with respect to immunity that goes with sovereignty. So when Your Honor says, why is it important to the Seminole tribe that this issue be particularly addressed, it's because the lower court failed to respect that immunity, which in turn failed to respect the tribal sovereignty, and that goes to the core of the Seminole tribe's self-identity. So that's the reason. Thank you. Can I just ask you, thank you for that, Mr. Richard. Do you disagree with anything that your friend, Ms. Heron, said in her rebuttal with respect to how the compact deemed to have occurred language should be construed by the secretary or in this court? Well, I'm not sure when you say everything because I don't remember everything, but I will say that the tribe's position is that it complies with state law, but that question ultimately is on the part of the Supreme Court, and it's not an issue for IGRA. IGRA clearly authorizes the states and the tribes to adopt compacts that touch this subject. And the other thing I would mention, Your Honor, is that there's only one reason that IGRA talks about on Indian lands, and it wasn't intended to restrict the tribes to Indian lands. IGRA was a direct response by Congress to Cabellon, and Cabellon said that states could not regulate gaming on Indian land. So that's the only issue that IGRA was intended to address. Nothing in IGRA suggests that it was the intent of Congress when IGRA was passed to restrict the Indians in a way that any other gaming enterprise in the state were not restricted. So there's nothing in IGRA. IGRA is just the opposite. IGRA was intended to encourage the states and the tribes to enter in agreements precisely like this one. All right, thank you. Judge Henderson, anything? No, thank you. All right, I think we have the arguments. We thank you for your presentations. We will take the case under review.
judges: Henderson, Wilkins, Childs